IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH CARDY,                                                    CV. 05-1572-AS

                Plaintiff,                        FINDINGS AND
                                                                 RECOMMENDATION

      v.

JOANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

_____

ASHMANSKAS, Magistrate Judge:

     Plaintiff Deborah Cardy ("Cardy") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. §405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner"), who discontinued her social security

disability insurance benefits ("Benefits") based on a finding that she completed a trial work period

in January 1989, her 36-month extended period of eligibility expired in February 1992 and she

engaged in substantial gainful activity in January 1999.

/ / / / /

PROCEDURE

Set forth below is the complicated procedural history of this case as described by the ALJ in his decision. The court acknowledges that Cardy disputes the statement that she completed her trial work period in January 1989 and her extended period of eligibility in February 1992.

The claimant, Deborah Cardy, became entitled to a period of disability and disability insurance benefits in May 1987, based on a back injury that was sustained on August 21, 1986. She completed her trial work period in January 1989, and entered into her 36-month extended period of eligibility, beginning February 1989, and ending as early as February 1992.

The claimant filed an application for supplemental security income (SSI) based on disability in December 1999, with which she submitted a Plan for Achieving Self-Support (PASS). Normally, the claimant's social security disability income would have been too high for her to qualify for SSI payments. However, the PASS provides eligible disabled individuals with a method to shelter income while achieving an occupational goal. The sheltered income is used to finance the goal, while the SSI payments are designated as living expenses. The claimant's stated goal was to operate a vacation property management company. The claimant's PASS was approved retroactively to her application date for SSI payments.

The claimant's involvement in the property management company triggered a review of her continuing entitlement to disability insurance benefits. In October 2002, she was informed that her work efforts since January 1999 constituted substantial gainful activity, and that her entitlement to disability benefits ended on March 31, 1999. When the claimant lost her disability insurance benefits, she lost the income that she was to shelter to accomplish her PASS objective. Therefore, she could no longer participate in the PASS, and her eligibility for supplement security income ended. The claimant was notified of the cessation of her disability insurance benefits on January 27, 2003. She asked that this decision be reconsidered, and, in a notice dated February 27, 2003, the Social Security Administration upheld the original determination. The matter is now before the undersigned Administrative Law Judge based on the claimant's request for hearing, timely filed on March 31, 2003.

A hearing was held on February 10, 2005, in Pueblo, Colorado, before the undersigned Administrative Law Judge. The claimant personally appeared and testified, represented by Julie Reisken, a non-attorney advocate, who [has] waived her right to charge and collect a fee under section 206 of the Social Security Act. Following the hearing, the representative was allowed 30 days to submit a brief in support of the claimant's position. This brief has been entered into the record as Exhibit 25, The Administrative Law Judge has carefully considered all of the

documents identified in the record as exhibits, the testimony at the hearing, and the arguments presented.

Administrative Record ("A.R.") at 11-12.  The ALJ found that Cardy had engaged in substantial gainful activity as of January 1999, and that her entitlement to Benefits ended in March 1999.  The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

FACTS

Cardy applied for PASS in 1999.  It appears that Cardy wanted to set aside money from her Benefits to fund her new business, Peace of Mind Vacations and Property Management (the "Business"), and to live off a new award of supplemental security income.  She was awarded PASS in 2002, effective for five years beginning in February 2000.  The PASS allowed her to use $609 of her Benefits for the Business each month and awarded her a monthly supplemental security income benefit of $545, which she combined with the remaining $20 in Benefits to pay her living expenses.

Cardy prepared a business plan in the summer of 2001 (the "Plan").  The Plan was prepared to assist Cardy in obtaining financing for three-years operating expenses for the Business, estimated to be $515,740.  Cardy provided the Plan to the Commissioner and to at least one financial institution.

In the Plan, Cardy represented that the Business began in 1998.  Initially, the Business engaged in the rental of private homes to the general public for vacations.  The Plan indicates that the Business was to expand to include travel and vacation planning, home construction, property repairs and maintenance and real estate sales and services.

Cardy described the Business as a sole proprietorship.  Cardy was the owner and a key

employee.  She indicated that she has "many years of experience in the vacation property management industry in both Park and Summit Counties" and that she "excels in Home Design and Construction." A.R. at 24.

The Business was reported to be successful from the outset, turning a profit in the first three years.  The Plan indicated that the Business had revenues of $180,300 and expenses of $160,252, for a net profit of $20,040, in 1999. A.R. at 34.

Cardy's tax return for 1999, which was prepared in September 2002, shows business income from the Business of $23,948, wages of $66, social security benefits of $95 and a loss of $19,233 for adjusted gross income of $3,184.  The loss is described as "Net Operating loss carryback from 2001.  Election made in 2001 to forgo possible five year carryback period." A.R. at 60.

On February 14, 2002,[1] and again on May 14, 2002, Nancy Reinhardt, a claims representative for the Social Security Administration, requested that Cardy complete some forms and provide tax returns from 1998 to 2000, based on Cardy's report that she had been working in the Business since 1998.  On October 11, 2002, Reinhardt reminded Cardy of the promise to forward the tax returns and forms made on July 24, 2002, and advised that Reinhardt would have to move forward without the forms if she did not  receive them by October 18, 2002.  On October 30, 2002, Reinhardt determined that Cardy's disability had ceased in January 1999 based on her involvement in the Business and that she was last entitled to Benefits in March 1999.  Cardy was given 15 days to respond to the determination.

In documents dated November 8, 2002, Cardy denied that the Business was open "like a real business due to health issues," in 1998 or 1999. A.R. at 98.  Cardy indicated that she engaged in a

---

[1]Cardy represented that she never received this correspondence.

trial work period from April 1 to August 15, 1999, while working for Greyhound Buslines.[2]  She was terminated when she found out that she had cancer and, from August 15, 1999, to July of 2000, she was fighting the cancer.  She stated that the tax returns prepared in September 2002 were "not correct yet. But closer." A.R. at 96.   Cardy explained that she had not yet paid herself a wage but allowed the Business to "offset food or medications for my use, or if I have other needs." A.R. at 97.  Cardy's unpaid medical expenses were approximately $300 per month.   However, she also represented that she had monthly income of $545 from the Business in 2001 and 2002 and that the Business had not yet made a profit.

As of the end of 2002, Cardy worked up to 30 hours a week in the Business. She answered phones, set up appointments, did most of the hiring and signed payroll and accounts payable checks. During the period she was sick and unable to work in the office, Cardy handled the marketing, planning and research and development from her bed.  Cardy indicated that she was currently assisted in the Businesses by two other employees. Cardy's boyfriend and primary caretaker, Doug Johnson, helped her out in the business but did not get paid for his services.  Leslie Green was the only paid employee and received an hourly wage of $13.00.[3]

On January 16, 2003, Reinhardt determined that, despite the information provided by Cardy, she had performed substantial services in 1999.  Reinhardt based this determination on Cardy's earning records, which indicated that she had $40,633 in earnings from self-employment in 1999.  She felt that, based on Cardy's description of her job duties, Cardy's services were significant to the

---

[2]Cardy's representative wrote in her closing brief that Cardy was the regional manager for Greyhound Lines managing the Frisco, Colorado, office.

[3]Records provided by Cardy show that she paid wages to 19 other employees in 2001.

operation of the Business and that she received a substantial income from the Business. Under the Act, a claimant receives substantial income if they make more than $500 a month from January - June 1999. Cardy's average monthly earnings in 1999 were $3,386. Even subtracting the $300 in unpaid medical expenses, Cardy did not fall below the statutory substantial income amount. A.R. at 122. Because Cardy had completed her trial work period in January 1989, and her extended period of eligibility expired in January 1992, she was no longer entitled to Benefits as of March 1999. Cardy's entitlement to PASS and supplemental security income terminated in conjunction with the end of her disability.

Cardy requested reconsideration of the decision to terminate her Benefits, asserting that "The work history was unfairly reviewed – PASS allows me to work – Taxes for 1999-2000 & 2001 are all being amended – This was simply a mistake made by overpaid acct." A.R. at 132. The prior decision was affirmed after reconsideration. Cardy then requested a hearing, stating that "A mistake was made on tax returns which went unnoticed till SSA found problem – Instead of allowing an amended return – I was dropped from all programs." A. R. at 142.

At the hearing, the ALJ entered records related to the Business and the Commissioner's rulings based on Cardy's involvement in the Business. The ALJ questioned whether any of the records from the prior disability determination should be entered as well. Julie Reiskin, Cardy's representative, indicated that they should not be admitted or considered in Cardy's non-disability determination. Reiskin also conceded that Cardy engaged in a work trial period in the 1980's and that Cardy may have received an overpayment of Benefits for one month in 1999 while Cardy worker on a commission bases for Greyhound Buslines.

Cardy testified  that she started the Business in January 2000, had gross receipts of

$144,905.05 and total expenditures of $154,916.67 for a net loss of $10,011.62. Cardy borrowed a total of $18,038.47 from Pioneer Bank and her boyfriend. The ALJ then questioned Cardy about receipts of $179,884 from the Business for 1999 listed on a document provided to the ALJ at the hearing.[4] Cardy explained that "those receipts are part of – I went through a voluntary audit with the IRS, and those receipts are based on Dr. Allison, who's my primary care giver, and in there I broke down everything, so even Greyhound is on there, What I had to pay out in wages and commissions. So I broke down every dollar that was seen in my checking account." A.R. at 264. Cardy indicated that she had a joint checking account with her boyfriend, that Doug had his own drywall business in 1999 and that she included $71,000 worth of cash generated by her selling Greyhound bus tickets for Greyhound. Cardy then stated that she paid Greyhound $71,785 for the tickets and paid $42,000 in wages and commissions to her employees and that the receipts from the Greyhound business were included in the total receipts of $179,884.27.

Cardy was terminated by Greyhound in the summer of 1999, after it learned of her cancer diagnosis. Cardy indicated that she was not cleared to go back to work until August 2000 and that she was limited to an hour a day. Thereafter, she attempted to run the Business by making calls and directing people at a low level.

As a result of Cardy's poor health, the wages and commissions she paid to her employees equaled more than 45% of the Business's total receipts (which were $144,905.05 in 2000). The ALJ questioned Cardy about why she would continue to run the Business when it posted a loss of $10,000 in 2000, $13,000 in 2001 and $25,000 in 2002. Cardy explained that the decrease in travel

---

[4]This document does not appear to be in the record. The amended tax returns filed in August 2003 indicate gross receipts of 173,884 but the figure does coincide with gross receipts on the tax returns drafted in September 2002.

caused by the events of September 11, 2001, and the damage to Park County by the Hayman fire in 2002 really affected the Business.

The ALJ also expressed surprise that the People's Bank would continue to loan up to $84,000 to the Business when it was continuously losing money.  Cardy explained that People's Bank had been told that she was going to receive $515,000  from PASS to fund the Business, which later turned out to be inaccurate.  Cardy closed the Business in December 2003 when she moved to Oregon to continue her cancer treatment. The ALJ left the record open for Cardy's representative to file a closing brief, the amended tax records filed in August 2003, the business plan provided to PASS and the banks with Cardy's request for financing and a statement from Diane Viter, Cardy's PASS cadre.

In her closing brief, Reiskin described the duties Cardy performed as regional manager for Greyhound Lines, which involved managing the Frisco, Colorado, office for several months in 1999. "The position was basically a commission position whereby Ms. Cardy would purchase tickets from Greyhound for sale.  She was also responsible for keeping the local ticket sales location staffed and open and handling adjunct responsibilities that go with a rural ticket outlet.  She was successful at this position, however, before three months was up, she was diagnosed with cancer in July 1999." A.R. at 150-151. Cardy was unable to work between August 1999 and February 2000, and again after surgery on April 15, 2000, through August 2000.

Reiskin argued that Cardy did not meet the relevant tests for substantial gainful employment because she did not work in the Business at all in 1999, she relied on employees to perform

/ / / / /

/ / / / /

management tasks,[5] and she did not have substantial income from her work in the Business.  Reiskin asserted that all of Cardy's income for 1999 came from her employment with Greyhound.

Reiskin provided the amended tax returns for 1999 through 2002 with her closing brief.  The 1999 tax documents show that the Business paid seven employees a total of $9,115.32 in wages; had total receipts of $173,884; total expenses of $167,021 (which includes $114.571 in wages); a net profit of $6,863.00, and that Cardy's car was placed in service for the business on December 1, 1999. The Business had total receipts of $136,909 in 2000, $194,208 in 2001, $134,817 in 2002.  Reiskin also submitted a copy of the Plan.  The Plan submitted by Reiskin did not include the financial results for the Business from 1998 to 2001 but did contain the representation that the Business "began in 1998 providing lodging services for homeowners and guests." A.R. at 200.

After receiving the ALJ's decision, Reiskin appealed to the Appeals Council.  In her brief, Reiskin stated that "there is no dispute that the trial work period ended quite some time ago." A.R. at 237.   She also indicated that "We have no dispute" with regard to the ALJ's first three findings. A.R. at 244.  These findings provide that:

   1.  The claimant was found to be disabled within the meaning of the Social Security

   Act beginning August 21, 1986.

   2.  The claimant completed her trial work period in January 1989.

   3. The 36th month of the extended period of eligibility ended in February 1992.

A.R. at 16 (citations omitted).

/ / / / /

---

   [5]These tasks included "going from property to property, overseeing cleaning and home improvement projects, activating marketing ideas, etc.  Even working on the telephone she needed help from either employees or unpaid help to follow up on the outcome of the call.

## ALJ Decision

The ALJ set forth the standard for determining whether a self-employed claimant is engaged in substantial gainful activity as set forth in 20 C.F.R. § 404.1575. The ALJ found that Cardy was not engaged in substantial gainful activity under either Test Two[6] or Test Three.[7] The ALJ then considered Cardy's work activities under Test One, which he summarized as follows:

> Test One:  The claimant renders services that are significant to the operation of the business and receives a substantial income from the business. If the business is operated solely by the claimant, any services rendered are significant to the business. If the business involves the services of more than one person, services are significant if the claimant contributes more than half the total time required for the management of the business, or more than 45 hours a month regardless of the total management time required by the business.  Income is substantial, if, after deducting normal business expenses, the reasonable value of any significant amount of unpaid help furnished by others, and impairment-related work expenses, the remaining income averages more than the applicable standard for substantial gainful activity; or is either comparable to the income received by the claimant before she became disabled or comparable to that of unimpaired self-employed persons in the community who are in the same or a similar business as their means of livelihood.

A.R. at 12.

The ALJ's analysis, which is set forth at page 5 of his opinion, reads:

The evidence, provided within the claimant's business plan, establishes that the company was started in 1998. As recently as January 2005, the claimant states that she had been involved in the business since 1999. She owned the company, and testified that she had 30 years of experience in property management.  Signed

---

[6]Test Two provides that "you have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar business as their means of livelihood." 20 C.F.R. § 404.1575(2)

[7]Test Three provides that "you have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing." 20 C.F.R. § 404.1575(3).

statements, over the penalty clause, indicate that the claimant answered the telephone, booked reservations, performed computer activities, scheduled work for her employees, hired new employees, and signed company checks for payroll and accounts payable. By any measure, even the amended return for 1999 reveals that the company established a significant level of business activity, with gross receipts exceeding $173,000. The business plan indicates that health concerns did not become an issue until 2000. The claimant applied for a bank loan, and credit was extended to her based upon her earning potential. Banks do not loan money to passive business owners without collateral, who do not indicate that they are actively involved in the management of their companies. In 2005, the claimant stated that she worked four hours per day, seven days per week, and that she became too disabled to work in December 2003.

The two issues that must be resolved are: 1) whether the claimant's work activities for her company have ever risen to a level commensurate with the performance of substantial gainful activity; and if so, 2) when her work activities rose to this level. The undersigned cannot find the claimant credible that she performed no significant work activities, or that her business was not started until 2000. Her own business plan and the tax return for 1999 belied this argument. No adequate explanation [h]as been provided to account for the large revenues received by the business prior to its alleged inception. The claimant has attested to the Social Security Administration that she would work at least 28 hours per week. As a practical matter, her payroll, personnel management, marketing, planning, and research and development skills, when combined with her testimony concerning many decades of property management experience, would reasonably indicate that her services were worth more than $500 per month – the applicable standard for substantial gainful activity in January 1999 – even after deducting the claimant's alleged impairment related work expenses of $300 per month. The undersigned rejects the argument that a portion of the salary already paid to other employees of the company should be used as an impairment related work expense, as these other individuals have to take over her functions when she was unable to perform them. While these employees may have filled in for the claimant when she was unable to perform some duties, there is no indication that they were hired as attendant care providers for her, rather than as employees of the company. Furthermore, the unpaid help attributed to others cannot be used as an impairment related work expense, as there was no expense incurred.

A.R. at 15-16. The ALJ determined that Cardy had not "met her burden of proof in establishing that she did not return to substantial and gainful employment by at least January 1999." A.R. at 16. Because Cardy completed her trial work period in January 1989 and her 36-month period of extended eligibility ended in February 1992, the ALJ found that Cardy's disability ceased in January

1999 and that her eligibility for Benefits ended on March 31, 1999.

STANDARD OF REVIEW

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The burden of proof to establish a disability rests upon the claimant.  Gomez v. Chater, 74 F.3d 967, 970 (9th Cir.), cert. denied, 519 U.S. 881 (1996).  To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A).  An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2) (A).

Here, the Commissioner determined that Cardy was disabled as of August 21, 1986.  That finding is not under dispute.  Instead, the finding at issue is whether Cardy engaged in substantial gainful activity while working in the Business in 1999.  In other words, the question is whether Cardy's disability has ceased and her Benefits should be terminated rather than whether Cardy's physical or mental impairments entitled her to Benefits.

As in disability cases, the initial burden of establishing disability rests upon the claimant.  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); Patti v. Schweiker, 669 F.2d 582, 587 (9th Cir. 1982).  However, for the purposes of determining if disability has ended, the claimant is also entitled to a presumption of continuing disability, requiring the Commissioner to produce rebuttal evidence.

<u>Patti</u>, 669 F.2d at 586-87.  This presumption of continuing disability does not affect the ultimate burden of persuasion, which remains on the claimant, to prove entitlement to Benefits. <u>Tidwell</u>, 161 F.3d at 601; <u>Patti</u>, 669 F.2d at 587.

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  <u>Hammock v. Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)).  The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).

<u>DISCUSSION</u>

Cardy argues that the record does not support the ALJ's finding that she completed a trial work period in January 1989 and that her extended 36-months eligibility period ended in February 1992.  This is the first time that she has raised this argument.  At the hearing before the ALJ, Reiskin acknowledged that Cardy had engaged in a trial work period in the 1980's and declined the offer of the ALJ to admit Cardy's prior disability file into the record.  In her brief appealing the ALJ's decision, Reiskin concedes that "there is no dispute that the trial work period ended quite some time ago." A.R. at 237.  Additionally, she states that "We have no dispute" with regard to the ALJ's first three findings, which include the completion of the trial work period and termination of the extended eligibility period.

Based on Reiskin's statements, the ALJ reasonably relied on the prior determinations and did develop the record in that regard.  The completion of the trial work period and the extended 36-

month eligibility period was not an issue in the underlying proceedings and cannot be made an issue now.  When a claimant is represented by counsel, they must present all issues and evidence at their administrative hearing in order to preserve them on appeal. Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999).

Cardy also argues that the record does not support the ALJ's finding that Cardy performed substantial gainful activity in January 1999 based on her involvement in the Business.  Specifically, Cardy argues that the ALJ:  1) improperly referred to her application for Benefits filed in 2005 because the application was not a part of the record; 2) failed to distinguish between Cardy's monthly work activity in 1999;  3) failed to acknowledge Cardy's unsuccessful work attempt with Greyhound in 1999, or that at least a portion of her income for 1999 relates to that work activity; and 4) failed to develop the record with regard to Cardy's actual work activity in the Business for each month of 1999.

The ALJ references Cardy's 2005 application for Benefits in his opinion and at the hearing despite the absence of the 2005 application from the record.  The court agrees that the ALJ should not have considered the 2005 application.  However, the 2005 application did not include information that was not contained in other evidence properly in the record.

The Plan was prepared by Cardy in the summer of 2001 and was provided to both the Social Security Administration and financial institutions for the purpose of obtaining funding for the Business.  Cardy indicated in the Plan that the Business started in 1998 and that it made a net profit of 20,040 in 1999.[8]  Cardy listed herself as the sole proprietor, or "owner," of the Business and

---

[8]Reinhardt relied on reported earnings of $40,633 from self-employment in 1999 in finding that Cardy had monthly earnings of $3,386 that year.  There is no indication where this figure came from and it is only found in the record in documents generated by the

represented that she was a key employee with many years of experience in the vacation property management industry.  The Business tax returns for 1999 show  a profit of between $6,863 and $23,948 with up to $114,571 paid out in wages and indicate that Cardy's vehicle was used for the Business in 1999.  This evidence is sufficient to support a finding that Cardy engaged in substantial gainful activity in 1999, rebut the presumption that Cardy's disability continued and to place the burden on Cardy to prove that she was still disabled during that time.

Despite representations in the Plan, which were relied on by the Administration in granting the PASS and supplemental security income benefits and by a bank in loaning almost $85,000 to the business, Cardy now denies that she started the Business in 1999 or that the Business ever had a profitable year.  She states that the earnings of approximately $175,000 attributed to the Business in 1999 were generated by her boyfriend, who ran a drywall business, and her three-months of work for Greyhound Bus Lines.  However, Cardy did not provide any documentation to support these claims.  In fact, the evidence presented by Cardy discounts these statements. The Plan clearly shows the Business was open and profitable in 1999 and Cardy's 1999 tax returns establish that she claimed all the earnings from the Business, described as a "property management and maintenance" business, as her own.

The ALJ specifically discounted Cardy's testimony regarding the status of the  Business in 1999 or her involvement in the Business that year.  He points to the Plan and the 1999 tax returns as well as the absence of an adequate explanation for the large revenues received by the Business in 1999.  He then found that Cardy's experience and knowledge in property management, combined with the services she admitted she performed for the Business after it opened, were significant to

---

Commissioner.  The court does not rely on this evidence in reaching its conclusion in this matter.

the Business and were worth more than applicable standard for substantial gainful activity.[9]  These findings are supported by the record and should not be overruled.

Cardy's assertion that the ALJ erred by not developing the record is without merit.  In social security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that claimant's interests are considered, even when claimant is represented by counsel.  The ALJ's duty to develop the record further in social security disability case is triggered when there is ambiguous evidence, or when the record is inadequate to allow for proper evaluation of evidence. Id.  This duty derives in part from the basic premise that disability hearings are not adversarial in nature. See Sims v. Apfel, 530 U.S. 103, 110-111 (2000).  It is also based on the regulatory directive that, in an administrative hearing, the ALJ "looks fully into the issues." 20 C.F.R. §§ 404.944.

Cardy complains that the ALJ did not question Cardy about her monthly work activity in the Business and Greyhound in 1999 or about her income during that period.  The court disagrees.  The transcript of the hearing shows that the ALJ asked questions about all of these issues but that Cardy's responses prevented him from obtaining relevant evidence. When questioned about her activities in 1999, Cardy claimed that she did not open the Business until 2000, a claim which clearly contradicts her statements in the Plan and her 1999 tax returns.  The ALJ could hardly question Cardy about her work in the Business  in 1999 when she continually denies that Business existed at that time.

Cardy's response to the ALJ's questions about her 1999 earnings and her work with

---

[9]Even assuming that the Business only made $6,863 in 1999, as evidenced by the amended returns filed in 2003, and taking into consideration Cardy's representation that she did not work after August 15, 1999, Cardy averaged $807 in earnings during the months she worked in 1999.  After deducting $300 for unpaid medical expenses, Cardy still earned more that $500 monthly, the standard for a substantial income during the relevant period.

Greyhound was disjointed and confusing. When asked about the nearly $180,000 listed as earnings for the Business, Cardy explained that she went through an IRS audit, she mentioned her primary care giver, stated that Greyhound was listed in there and that she had included every dollar that was in her checking account, which she shared with her boyfriend. With regard to her Greyhound earnings, she represented that she  included $71,000 worth of cash generated by her selling Greyhound bus tickets in the Business earnings for 1999. Cardy then stated that she paid Greyhound $71,785 for the tickets and paid $42,000 in wages and commissions to her employees, which clearly would have resulted in a loss of over $40,000, not earnings.

The ALJ asked relevant questions in an attempt to obtain information about Cardy's work and earnings in 1999. The information obtained was either contradicted by other evidence in the record or was so confusing that it was of little help.[10] In a further attempt to develop the record, the ALJ kept the record open to allow Reiskin to file a closing brief and additional documentation that would help Cardy establish a continuing disability. Other than the amended tax returns for the Business, the additional documentation did not provide any new evidence. The ALJ met his burden to fully develop the record. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999).

## CONCLUSION

The Commissioner's findings on Cardy's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be affirmed.

## Scheduling Order

---

[10]On a few occasions, the ALJ mentioned that Cardy was not answering the question asked, cautioned Cardy about trying to discuss too many issues at once and expressed frustration that he was not getting an answer to anything. "Well I get distracted. We're bouncing around so much * * * that I don't have * * * an answer to * * * anything." A.R. at 275.

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **January 18, 2007**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 28th day of December, 2006.


                                    /s/  Donald C. Ashmanskas
                                    DONALD C. ASHMANSKAS
                                    United States Magistrate Judge